Mr. Richards, you've chosen 11 minutes for your main argument and 4 for rebuttal. I just want to confirm that? That's correct, Your Honor. Okay, and you understand the lighting arrangements? I do. Okay, you can go ahead and start whenever you're ready. Your Honor, there are a number of very important and controversial legal issues that this appeal presents. I think those have been covered very thoroughly in the briefs, in part, I think, because both parties recognize their importance as a matter of law. I think what's been covered a little less thoroughly in the briefs is the story of this case, this particular case. So I'd like to begin by trying to tell that story in a simple way, because I think it puts legal issues in perspective and helps one understand how to deal with them. The story really begins with Bayer obtaining the 444 patent in 1987 through a fraud on the Patent and Trademark Office. Bayer got that patent. Initially, Bayer applied for the patent, and the patent was rejected on grounds of structural obviousness. Bayer then overcame that rejection on grounds of structural obviousness by making representations that the compounds of the invention, all of them, had superior antibacterial effectiveness over prior art compounds. That was untrue. Their own witnesses have admitted in the prior patent litigation with Bayer that that was untrue. It was on the basis of that that the Patent and Trademark Office issued the broad patent covering all of those compounds. I'm just digressing into the law for a second. One of the issues before the Court is but for materiality. It's completely inexplicable that the patent would have been so broad had they not accepted the representation as to all the compounds that were the subject of the invention. As to but for materiality, we should be getting summary judgment. There's just no question about it. Mr. Richards, I don't want to interrupt you, and you are obviously free to conduct your argument as you wish. There are a number of issues in this case, and if the parties need it, there will be some additional time extended. However, it does seem to me that what you're talking about here now are sort of background facts which we're aware of them. Again, use your argument time as you wish, but I would think you might want to focus on the critical issues that were decided in the District Court opinion. Thank you, Robert. Along those lines, can I ask you a question? Yes. Can I move forward? Do you agree or concede that there's an area of exclusion under the patent that provides protections from antitrust law? We don't concede that the face of the patent describes a zone of exclusion, which is the phrase that Judge Trager used, that's absolutely protected in the absence of sham litigation. We think that's the wrong standard. We think that the court has to evaluate the strengths and weaknesses of the patent as part of the antitrust analysis. And in expressing that point- And in your view, that's true only in the Hatch-Waxman context because there's so many other factors or in all contexts? It's hard for me to address other factors. We have a Hatch-Waxman case in front of us. In the Hatch-Waxman context, we're proposing what we think the legal standard should be and to what extent it might apply in other cases. I think it should be left to other cases because they might be very, very different. The Hatch-Waxman context- That may be a problem that you can avoid. It may not be one that we can solve. Well, Hatch-Waxman does introduce a number of complexities that affect the analysis, and it's important to get the law right for purposes of Hatch-Waxman cases. And then whether that's the right rule for some other case, I think, is an issue to be decided in that other case. But what the court basically held here is that the face of the patent provides absolute protection. So if you have- under this court's ruling, if the brand name drug manufacturer were to pay the generic drug manufacturer 10 times what the generic was going to make by coming to market, and the patent were extremely weak, and it's clear that what was going to happen is that the consumers would get the consumer surplus and prices would go down, and all they're really doing is the brand name drug manufacturer paying some of its profits to the generic drug manufacturer in order not to lose, it would still be okay. But it seems to me, and going back to the other point about distinguishing this Hatch-Waxman context for the others, that as I understood it, you were arguing that the reason that's problematic in the Hatch-Waxman context is because other generic manufacturers are less likely to pursue a challenge. That is one of the main factors that we identified. Okay, and my question is why? Why are they less motivated? I mean, we all know in hindsight that they did here pursue the challenge. Why are they less like- There are a number of reasons. One is the Hatch-Waxman fact that the first challenger gets 180 days of exclusivity. Only the first challenger gets that 180- Yeah, and I guess, so let me, I hate to keep interrupting, but let's take that point. It seems to me this case is not a case that implicates the 180-day exclusivity. I think it would be a very different case if it did, and maybe we can ask the other side about that, but the district court concluded clearly, did he not, that the 180-day exclusivity issue was not in play here. He made that determination by relying on his prior decision, denying our motion for partial summary judgment, and treating that as though that resolved the issue. When we get the benefit of the inferences, reasonable inferences on the defendant's motion, and they get the benefit on our motion. Well, his view was quite clear as I recall it, which is that they don't get the 180 days because the FDA regulations in effect at the time clearly precludes them from getting the 180 days. No, it's more subtle than that. At the time that the deal was made, in early 1997, Barr expected to and planned to use its 180-day exclusivity period to discourage other generics from challenging the patent. And there's testimony from Mylan, the next challenger, conceding that they delayed filing their ANDA for two and a half years after that point because they knew that even if they won, then there'd be a 180-day exclusivity period after that that would go to Barr. So you mean when all of these other generics came in and challenged the patent, they were under the impression that the 180-day exclusivity period was no longer in play? No, not the later ones, but Mylan. So it delayed Mylan's challenge for two and a half years. Well, is it your view that Mylan was correct if that was their assessment? Then the law changed. Mylan commenced its challenge to the patent at the time when the law changed, and they realized, oh, we aren't burdened by this 180-day exclusivity period, so now we'll bring the challenge. That's what happened with Mylan. Then there were other challengers. There was Shine. There was Carlsbad. By the time Shine and Carlsbad came along, there were only a couple of years left in the life of the patent, and they were just starting their litigation. If they had tried to litigate the full merits of the patent issues the way Barr had done, it would have taken the four years that Barr took before it settled, and they never could have exploited the patent because the patent would have expired. So what they did, and what Mylan did, too, ultimately, when it did commence its challenge, was narrow their challenge to a couple of very simple legal issues that they might be able to get resolved in time to actually exploit a victory before the patent is otherwise going to expire. And when they did that, all of those challengers, and this is uncontested, dropped, to the extent they'd ever asserted them, the inequitable conduct issues that had been the core of Barr's challenge to the patent. So those issues that are the basis of our Walker process claim, the primary basis of our assertion that the patent was weak at the time of the settlement, have never been adjudicated by any court. And they weren't adjudicated in the litigations by the later challengers because they didn't have time to litigate a case like that's conclusion in time to beat expiration of the patent. So if they had had a complex case like that that went on for three years, it wouldn't have done them any good and they would have wasted all their money because the patent's expiring anyway. So on a fundamental level on the facts of this case, what you have is a debate where the defendants time and time again say, well, there are these later generic victories. Richard, let me ask you, you make the point, I think you're correct, that inequitable conduct was never litigated, correct? That's correct. And there was some other validity, were there any other, that's an enforceability, were there any validity challenges? There were validity challenges, but in none of those cases, none of those challenges that ultimately got resolved by the courts were the inequitable conduct issues that are the basis for our case and for the weakness of the patent resolved. Would you say, assume for the moment this case were to go back to the district court, would you say that before there could be any determination of antitrust liability, there had to be a determination of inequitable conduct? Not of inequitable. Wouldn't that seem to be the case? Not of inequitable conduct, because to the extent the antitrust liability is premised on Walker process, it has to be Walker process fraud, because that's what Walker process says. That would get you into the un- And that has common factual dimensions to the inequitable conduct, but it wouldn't be a trial of inequitable conduct as such. As to the sham litigation component of the monopolization claim, yes, it would involve all of the elements of inequitable conduct that are in our complaint, and as to the weakness of the patent, to the extent that's an element of the analysis on the reverse payment, we would submit that those facts are properly considered as well. But when you say the weakness of the patent, what specifically do you have in mind there? Weak in what way? Weak on any basis. A likelihood based on an observation of the patent,  I've always had thought, maybe incorrectly, that a patent is either alive and kicking, so to speak, or it's dead. There's no kind of weak middle ground. I mean, you have a patent and it hasn't been determined to be invalid or to have been obtained by inequitable conduct. That patent is alive and well. Now, if claims have been found to be invalid or they're unenforceable, that's another matter. But I guess what I'm trying to say, is there such a thing as a weak patent? Wouldn't you have to establish that the patent was either completely invalid or completely unenforceable? Well, if I could, I'd like to put up the chart, because I think we're really getting now to what should the standard be and how should it work. Now, is this part of the record? I sent three copies of this to the court. We have no objection, Your Honor. With the 21 days' notice. Mr. Bartlett has no objection, so we can have it. Judge Pooler's dissent in the Tamoxifen case, and the 11th Circuit in Valley Drug, and the Solicitor General's brief to the Supreme Court in the Tamoxifen case, are all in agreement that in some way the strength of the patent needs properly to be part of the antitrust analysis of whether this is right or wrong. The only people who have disagreed with that are the district court that's on appeal here, and the majority in Tamoxifen, which is vigorously disagreed with by the dissent. Well, that's the Second Circuit. It's the Second Circuit. What Judge Pooler said, and we agree with. Judge Pooler puts her finger on the right factors when she talks about how the standards should work. She doesn't explain the way I'd like to explain how you put those things together. So we're trying to be helpful and make a proposal that's a little more comprehensive than what she said. What she says in her opinion is that the three factors, four factors, that should really be taken into account are the patent strength as it appeared at the time of the settlement, the amount of the payment, what the generic would have made by-comes-market. Now, we would submit that she's suggesting that you could balance one of those against the other, because that's the only thing that makes sense, but she doesn't go as far as to say that. And further, whether there are restraints beyond the face of the patent, the cork-in-the-bottle type of problem. And as to that last point, even the majority in Tamoxifen would agree that that's wrong. So with regard to situations where there's no cork-in-the-bottle, where there's no extension beyond the face of the patent, what she's basically saying is that the two key issues are the amount of the payment, how it compares to what the generic would have made to the strength of the patent. Suppose that the payment that's made is only a little bit more than the litigation costs, but the patent is very strong. That shouldn't be unlawful. Well, can I say, how does one determine, then, the strength of the patent in this context? I mean, five minutes ago, you were telling us how the challenge was compromised here because inequitable conduct would have taken years and years of discovery or whatever. So in what context is the judge here? Your view is that the district court should have done some preliminary evaluation of the validity of the patent? I think that the strength of the patent is an issue of fact to be resolved by the finder of fact. Now, absent some kind of special rule to make that the province of the court, that would be the province of the jury, unless it's suitable for summary judgment. But it would be part of an analysis to ask oneself, looking at the facts, what is the degree of weakness of the patent? It's not necessarily a question of fact. I mean, if it's inequitable conduct, there would be a bench trial, right? Well, in patent law for inequitable conduct, there would be. But I think in a damages case, constitutionally, as it stands right now,  And what is the question on the strength of the patent? Is it like a preliminary injunction where you find under our case law that there's a substantial question? Actually, the Solicitor General, in his brief to the Supreme Court in the Tamoxifen case, does suggest that perhaps procedurally this could be handled in some way like a preliminary injunction. I'm not sure exactly what he has in mind there. My own point of view, but I'm not trying to dictate policy. I just think it's the law, as it stands right now, is that that being a fact issue, unless there's an absence of issues of material fact that lends itself to summary judgment, it's a jury issue. I think that's just what the law is. It just seems like, to pick up on what Judge Prost was discussing with you, it just seems like it would be a very difficult, sort of amorphous task for a court to undertake, determining the relative strength of a patent, not determining necessarily that it's valid or invalid, but having experts come in and say, well, maybe it's subject to attack on this ground because of this prior art, or maybe it's not adequately supported by a written description of these claims. But without really coming to a determination, it just seems like it would be a very kind of a fuzzy operation. Well, I'd make two points in response. One is there are some cases where it really wouldn't be very complicated, and we think this is one of them. The case of Fred Battenoff, in this case, is very, very clear. Bayer's own witnesses with respect to this issue of misrepresenting the effectiveness of the compounds basically testified that these representations had been false. They agreed with that. The ship was headed down for Bayer, which is why it paid $400 million to the generic to disappear. I don't think that case is, A, would take very long to make, or B, is very complicated at all. Yes, there are some cases, though, I suppose, where the patent law issues could be much more complex. But the alternative to including some kind of analysis of the patent weakness is to require some kind of bright line rule on one side or the other. Some people have suggested that the bright line rule should be, you know, they don't need to make any kind of deal like this over litigation costs. They can settle it other ways, so the bright line rule should be no payments of this kind beyond litigation costs. And any payment made beyond litigation costs should be just unlawful. And a lot of people advocate that point of view. It's not an unreasonable point of view. We'd be happy to have that rule. Is that what's included in the current proposal pending in Congress? You know, I really haven't looked at that proposal lately to determine whether that is the specific content of it, but I think it comes close to that. I think that that's right. Well, can I take you back to the first point I raised, just because I want to be clear, and I'm sure it's me and not you. But on the bottleneck point, on the Hatch-Waxman point, is your case here, would you predicate it on this whatever this provision, the import of this provision was, this 100-day exclusivity portion of the settlement deal, or would you still be here, and would your arguments be precisely the same even if the settlement agreement had not included anything? Our primary arguments are twofold and separate from that issue. One argument is Walker process fraud. You don't even need to look at this reverse payment thing at all. You can jettison the whole analysis and just treat this as a Walker process case. That's point one. Point two is, you know, really primarily this case is a reverse payment case, having to do with the payment of the $4 million. But the presence of that 180-day exclusivity period becomes relevant. And one of the main ways it becomes very relevant and was going to be part of my short factual story is that it explains why this argument that Bayer makes about how it won these later victories, you know, doesn't hold any water. It's largely because of the role of the 180-day exclusivity period, which brought a couple years of delay, that you wound up having these generic challengers who were unable to have the time to resolve the core issue that Bayer had been ready to try. And tell me again why, because my understanding, and I'm looking at what the district court concluded in his initial thing where he dealt with this issue, he said the FDA regulation in effect at the time of the settlement agreement relied on, was based only on a successful defense of and-a-for, so that whatever was in the settlement agreement wouldn't have carried the day. There was a lot of controversy about this successful defense requirement. And at the end of the day, Mylan did not begin its case until it became clear as a matter of law that Bayer was not going to get the benefit of the 180-day exclusivity period. That 180-day exclusivity period was so discouraging to Mylan that they just stood back until that clarified. When it clarified as a matter of law, then they filed their end and they started their case. So that 180-day exclusivity period and its preservation by Barr as part of its deal with Bayer bought two and a half years of delay. At that point, there were four years left of patent life, very little time to get to judgment and exploit a victory on the patent, which then caused the later generic, and there's testimony on this by Mylan, and it's quoted in our brief, caused Mylan to drop the whole inequitable conduct issue because it's complex, it's factual, it would take a long time to get to trial on it. And this really gets to one of the key points about why the majority view in Tamoxifen and the district court's view here is wrong. The way, ultimately, that the majority in Tamoxifen and the district court here were able to say this will work out all right is to say, well, later generic challengers will solve the problem. It doesn't matter if a company like Bayer with a patent pays $400 million to buy off the first challenger because, you know, there's a line and other challengers... Jackson, now, I don't want to cut you off, but you've used up your rebuttal time and you've gone about five minutes over in addition. So we are going to have to ask you to sit down at this point. I will, however, restore your full rebuttal. Okay, thank you. You'll have your full four minutes of rebuttal. And we'll hear from Mr. Barlow. Mr. Barlow, we'll give you, if you need it, the same amount of total time that Mr. Erickson will have with his restored rebuttal. Yes, sir, thank you. And I will be arguing for all defendant appellees. Okay, fine. That's good. I'm sitting back there thinking that 11 years of my life is being boiled down into 15 minutes and I'm glad I get 20 minutes. Your Honor, to set the stage, as this court knows, this case is almost identical to the Cipro case pending now before the Second Circuit. We filed our brief today. That will be argued probably this summer, and the Second Circuit will have a decision on the antitrust issue, which is identical to the issue here. There's a difference. Second Circuit plaintiffs are direct purchasers. Here they're indirects. They're consumers. Of course, under federal law, indirect consumers can't recover damages under federal antitrust law under Illinois Brick. So what they did here was to put in Count 5, which is the claim walker process. And that's how we have jurisdiction. Well, it's interesting, sir. We moved to transfer both cases here. On the theory that the antitrust issue being pursued in the Southern District tends to water down patents, and anything that waters down patents ought to be before this court. The Second Circuit disagreed, so now we have the pure antitrust case here and we have the antitrust case plus walker process here. But this case was initially in the Second Circuit. Yes, it was, Your Honor. And they put it over here because of the walker process. And we moved it here because we thought these issues at the intersection of patent law and antitrust were issues for this court. But obviously the basis for them moving it over here was the walker process. Probably. Because they didn't agree with your argument with respect to the second case, right? Yes, sir. I'm sorry, Your Honor. Because that's our hook for jurisdiction, walker process. Yes. Now, I have to say at the beginning something that may surprise the court. The walker process case is demonstrably, facially frivolous. It's very important before I get into the preemption point that I touch on the merits of the walker process case. That's extremely important. Judge Trager said it was highly unlikely that the plaintiffs could ever prevail on the merits of the walker process case. What is the walker process case? They say that for four years we made general statements in the patent prosecution, statements like the compounds of the invention are superior. The compounds of the invention are far superior. They have unexpected qualities. From those general statements they extract a claim that we said that all of the compounds of the invention, and there are many, were all superior to the prior art, and they say that's a misrepresentation. We reply, well, this court, the Federal Circuit, has said those are general statements of superiority that examiners are cautioned not to rely on. They're supposed to wait until they get data. And, of course, the examiner here rejected the claims based solely on those conclusionary statements three times. In 82, 83, and 85 they reject it. Reply brief comes along. Plaintiffs say here it is, here is the document that the examiner, and this is in their brief at page 22, here is the document that the examiner issued the patent based on. This is page 7605 of the appendix. I have extra copies of this page if the court would like to see it but it may not be necessary. Here's the point. Remember, the claim is that we misrepresented that all compounds of the invention were superior to all of the prior art. This page shows two compounds of the invention, one on the right and one on the left. They're both compared to the prior art, which is in the center. The prior art is norfloxacin. The compound on the left is anephtharidine. The one on the right is cipro. The way we see if they're superior or not is we look at the numbers. If you look at the prior art number, it's a 1. If you look at the example 2 number, the anephtharidine, the number is a 4. If the examiner could tell that 1 is less than 4, the examiner knew there was no misrepresentation. We were telling the examiner that this compound of the invention on the left was inferior to the prior art norfloxacin. So the examiner could not have looked at this and said, ah-ha, they're representing that all compounds of the invention are superior to the prior art because it shows on its face we've disclosed a compound of the invention that is not superior to the prior art. So there's two things that are needed in Walker Process. A clear and convincing evidence of an intent to mislead. You don't mislead when you give data that anybody who can read knows doesn't say we're representing that anephtharidines are better than the prior art. It's on the face of it. Secondly, there has to be clear and convincing evidence the examiner relied on a misrepresentation. There was no misrepresentation. We know until this data came along the examiner did not issue the patent, and we know that this very document that in page 22 of their brief they rely on, we said exactly the truth. All compounds of the invention are not better than the prior art. Cipro is, but not anephtharidines over in this column. And I have record sites to this. These are pages 82-10, 82-16, appendix 75-57, and appendix 69-77-78. I know talking about anephtharidines and quinolones is a leap here on an argument like this, but the argument is frivolous. Now that we know the essence of the claim that's being made, then the preemption argument comes into perspective a lot better. Count 5 is very narrow, we now see. Count 5 is based entirely on what went on before the patent office, totally what went on before the patent office. As Judge Trager observed, it's based 100% on patent law. Now, Count 5 is really interesting because it lists, if the court please, 25 different state laws that appellates proposed to rely on for collateral attack on the PTO administrative process. Our main authorities are the Supreme Court's Buckman decision in 2001 and this court's Abbott decision. Buckman says policing fraud against federal agencies is not a field states occupy. It says the dealings with the FDA in that case there, they claim they got a bone screw released earlier by fraud. They say that's governed by federal law. There's a federal regulatory scheme. Having government regulatory issues litigated in the shadow of 50 states' tort regimes will increase the burdens on applicants. And finally, we advocate a very narrow rule. That's the very narrow rule of the Abbott case. The Abbott case said first that the actions before a board are not subject to collateral review under state tort laws. We don't do it that way. They say a state action would be an inappropriate collateral intrusion on the regulatory procedures of the PTO under guise of a complaint-sounding tort. And they say the PTO procedures themselves provide a remedy for Abbott's malfeasance, and, of course, that's Rule 56 that describes what the PTO does when we get involved with inequitable conduct. And then they say there's only a narrow question here, where if the cases go beyond exactly what happened before the PTO, for example, in the Dow case, which we're familiar with, certain traditional state law concerns may properly be raised, even though patent rights might ancillarily be litigated. It might bear on a state of mind or something. But where the case at bar, this is Abbott, relates directly to administrative proceedings before the PTO Board of Patent Appeals and Interferences, the PTO is preemptive. They say, well, there's more here than just what we did before the PTO. We filed a complaint. The Samsung case says that that adds nothing, that it's assumed that you get a patent to file a complaint and that if somebody does your dirt with your patent, you're going to sue them. So filing a complaint adds nothing to what is a basic collateral attack on what happened before the patent examiner. And you can imagine litigating under state laws all over the country, naphtheridines and quinolones and a five-year prosecution record, and this case falls squarely within the very, very narrow rule of Abbott. The antitrust issues. Tamoxifen adopted Judge Trager's ruling in this case as the law of the Second Circuit. Can I ask you about the issue I was struggling with before, which is the 180-day exclusivity? Yes. Because it seems to me that if Judge Trager had been persuaded that the 180-day exclusivity period were implicated by the settlement agreement, he might have decided this case differently. He would have. Agree? Of course. Right. So why is the other side not correct, that even though the regulation, in effect at the time, might have said otherwise, that it was enough in place so that it would have appropriately and reasonably discouraged Mylon? For this reason, Judge Probst, in their brief, page 37, they say there must be an actual effect on competition caused by any conduct before the expiration of the patent. An actual effect on competition. In the reply brief at page 8, they say, if a successful challenger had emerged, Barr would have claimed exclusivity. No successful challenger ever emerged. The fact is that there never was any exclusivity. The if never happened. Everybody that tried to enter, including Mylon who tried to enter, Shine who tried to enter. Why is that the correct inquiry? I mean, what you're looking at is whether or not, in terms of a bottleneck, am I wrong, that you're looking at whether or not other generics would have been dissuaded from going in and challenging the patent. So the potential, if they had a real legitimate claim to exclusivity, whether or not they were going to exercise, even if that was up in the air, couldn't the potential of that still have dissuaded the generics and caused a bottleneck? Well, number one, there wasn't a bottleneck. The potential did not dissuade generics. The generics entered. Mylon entered. Litigated. I'm asking you about the point that the other counsel made, which was that there was, at least for a period, enough of a question about the legal effect of the regulation that did dissuade Mylon from coming in for at least a two-and-a-half-year period. Do you disagree with that? What I'm saying is as a matter of law, Barr had no right to a period of exclusivity because they couldn't satisfy the successful defense standard as a matter of law. But what I'm saying is you don't even have to get into that interesting factual debate, legal debate, because the fact is that the argument runs people were deterred from entering. They were not deterred from entering. Carlsbad entered.  Well, how do we know? Ultimately, several of them came in. Including Mylon. What the other side was arguing was at least for the interim period, which the other side contends was very relevant in terms of the expiration date of the patent, that at least for a period of time. So can you focus on that period of time? We all know they ultimately came in. Sure, and there's a very clear answer to that. Let's assume for the sake of argument that somebody was delayed for a year or two. And then they ultimately tried to enter. And when they tried to enter, they failed. Somebody who was excluded by the validity of the patent, there wasn't any damage done by assuming, which we don't think the record shows, but assuming they were delayed, they were excluded not by what they thought Barr might do, but by the fact that we had a valid patent upheld twice before the PTO, held twice and three times in district courts, and upheld by this court in the Mylon case. But the reason that seems odd to me, so help me out here, is that what if we have hypothetically a case where you have a settlement agreement, that settlement agreement includes a clear 180-day exclusivity, legal or illegal, and nobody ever comes in? Are you saying that we would not strike down that settlement agreement even if nobody had ever come in and challenged the validity of the patent? I'm saying that's not our case. I'm saying in our case, people weren't deterred, they came in and they lost. So that that in and of itself, what you're saying is, even if there were a 180-day exclusivity, and even if it were real, if it were never exercised, the fact that other people came in and lost. I'm saying number one, as a matter of law, there was no 180-day exclusivity. But I'm saying that if there were, the law of this court and the law of the Second Circuit is, in a nutshell, unless a patent is shown to have been procured by fraud or a suit was going to be objectively baseless, then there's no antitrust recovery so long as competition is restrained only within the scope of the patent. So we know the patent is valid and we know that people tried to enter. We know their entry was stopped by the validity of a valid patent, a very broad valid patent. And we know that the people were not deterred by any hypothetical thought they might have had about the exclusivity period, which is a matter of law somebody couldn't have here because they weren't a successful challenger. And we know that they couldn't enter because when they tried to enter, they failed. So there's no injury to competition because the reason people were not able to enter is because it was a valid patent, not because of any exclusivity period. In other words, I say two things. I understand what you're saying. I say the exclusivity period, as a matter of law, didn't exist because Barr could not be... I understand that, but then what I'm struggling with is why, if there was a settlement agreement reached and it ensured Barr that they would get the 180-day exclusivity, then you're saying that the fact here that somebody ultimately came in and challenged the patent and won obviates any problem with that 180-day... Yes, Your Honor, but I'm also saying that as a matter of law, we could not guarantee Barr any exclusivity period. That's a matter of the operation. No, I understand that part of it. But I'm also saying that they're very careful in what they write in their brief at page 8. In the reply, they say, here's the problem. If a successful challenger had emerged, Barr would claim exclusivity. No successful challenger ever emerged. So there can't be any actual impact on competition from the market if I put the agreement to one side. Everybody was excluded from the market by the valid scope of a very broad, valid patent, not by anything else. It's the patents that did the exclusion. But in the alternative, if you've got a 180-day exclusivity agreement, which presumably everyone would assume would discourage other generics from coming in and challenging the patent, then you agree under those circumstances. It wouldn't help, but under the circumstance where somebody decides to bite the bullet and go in and challenge it, and it's proved to be valid, then the 180-day exclusivity period is okay. Well, we all know the Hatch-Waxman Act has worked beyond belief. The generics are very smart, very well financed. They bring these cases all the time. Anybody who could read would know that Barr had not conducted a successful defense. They had not conducted it. As a matter of law, they had no period. And we know, of course, that Miland didn't think that because they entered the market, tried to knock out the patent. We won in Trenton before Judge Brown, and we won in this court on appeal. So the challengers flooded in, and every time they flooded in, we had either a hearing with an appeal to this court or an actual trial where we won. It's a very, very strong, valid patent. And I guess we say that these arguments on how much money is paid in settlement are really proxies. It's a way of saying there's a proxy for whether the patent is valid or not. We don't need a proxy here because we know the patent is valid. I spent 11 years of my life litigating this patent. I was in all these courts and all these trials, and we made the settlement, and then we defended the patent to the hilt all over the country, including appeals to this court. Well, it seems a little odd, and I'm not going to belabor this, but the basis, it seems to me, of Judge Trager's decision was that the validity of the patent is irrelevant in terms of our scrutiny of the validity because it's just absolutely presumed. It strikes me as a little odd that a lot of your argument is relying on the subsequent adjudication of the validity of the patent, whereas I thought under Judge Trager's view that none of that matters. One way or the other, none of that matters. Well, I think the presumption of validity is strong, and Congress has had a lot of chances to change that as the Hatch-Waxman Act has been amended. They've never changed it, but to me, somebody who's challenging this patent and challenging the settlement, it would be comforting to know, A, that there was no bottleneck, B, that we submitted it to the PTO again, C, that challengers kept litigating and we litigated all over the country, and when the smoke settled after an appeal to this court, we had a valid patent. That seems comforting to me. Excuse me, but if you think that's so compelling, then why isn't the other side right? If you think that's such a compelling argument in the context of an antitrust delegation, then why isn't the other side right that it ought to be part of the threshold determination, that the judge ought to, I mean, they probably agree with you. It's important for the judge to make a determination in terms of evaluating the antitrust case as to the strength of the patent. That seems to me it's more their position than yours. I'm sitting here today thinking about a jury in Brooklyn deciding what a judge would have done in 1997, how that case would have turned out, how strong the patent is, and then a jury deciding what this court would do faced with a judge's finding on the ability of the patent. It strikes me that it's a bizarre proceeding that's being suggested. But particularly this case is not an appropriate vehicle for any of that sort of economic thinking because we have a valid patent. And the core of antitrust law is that competition, which is excluded by the broad terms of a valid patent, cannot create an antitrust violation. That's the core of antitrust patent law. So your view is if the patent in another case, in your case, except that ultimately there were no generics who came in and challenged the validity, so there would be no judicial determination as to validity, then this case would come out differently. I don't know about that case, Your Honor. I know about this case. I know that we made a decision to defend the patent to the hill, and we did it. And I think if you want to look at the amount of the settlement or the reasons for settlement, everybody knows what the Hatch-Waxman Act did. It tilted the incentives. So there was a big incentive for a generic to come in and risk only legal fees, and a big risk to the patent owner that they might lose the patent. So all these opinions, the Second Circuit, Judge Trager, made clear that a settlement in the context of the Hatch-Waxman Act doesn't mean what one might think it means because of the disproportionate incentives on the client and on the trial lawyer. Thank you, Your Honors. Thank you, Mr. Bartlett. We'll finish up with you, Mr. Erickson. Mr. Richards, you'll have your four minutes. Thank you. I'll just address the points that Mr. Bartlett made in sequence. The first point he made was that all we have here is general statements of superiority. That's not true. Bayer submitted data to back up its statements, lots of data. If you look, for example, at the appendix at pages 65, 67 to 75, there are data comparisons that were submitted. This was not just attorney advocacy. These were representations of fact purporting to be backed up by data. Second, Mr. Bartlett pointed out this chart with regard to the left-hand column and claimed that it's so clear that that's actually one of the compounds of the patent. It doesn't say that. It says it identifies this compound on this side of the chart as example two of German patent application such and such. That was one of the compounds of this patent. They misled the patent office into thinking that the bad performance data shown in that column was prior art that they were comparing the compounds of the invention to to show that the prior art here was better. And if there were otherwise any question about whether that's the way one would interpret that column, all one has to do is look at the testimony of Mr. Horn, who was Bayer's own attorney. And this is quoted on page 6582 of the appendix. This is actually one of the exhibits that Barr put together, which we got when privilege was waived. You're saying, Mr. Richards, this suggests, in your words, the weakness of the patent. The fatal flaws of the patent. Bayer's own attorney said, when asked, would anybody reading this paragraph think that example two in this column is, you know, one of the compounds of the invention? He says, I would say it's a possibility, not a likelihood. So his Bayer own attorney says, not likely that this would be construed the way Mr. Bartlett is arguing that it should be construed. He claims that there's no reliance. As I indicated before, the breadth of the patent covering all the compounds shows that they relied. When you look at the patent prosecution history on the representations with respect to the broad compounds, Mr. Bartlett suggested that this chart was the only basis for a case. Not so at all. If you look at appendix pages 6554 to 55, there's a very short two page exhibit, which again is one of the documents that Barr prepared and reflects its work product, which lists the three key statements in the 444 patent about the compounds, plural, all of them of the invention and quotes the testimony by Mr. Metzger, who was one of the inventors of the 444 patent, and by Mr. Simon, who was Bayer's patent agent, saying that, yeah, those statements refer to all the compounds of the invention. In fact, Dr. Metzger says, when asked, wouldn't you understand that to include all the compounds claimed, he says, at least those, yes. So he's saying compounds of the invention might be broader than what's actually in the patent. Yet the argument that Bayer's trying to make here, which is opposite of what its participants thought when they were doing this, is that it wouldn't be construed that way. I think maybe that ought to be summary judgment material for us on this issue of inequitable conduct, but they certainly can't get summary judgment. I mean, when their own people are interpreting what they did our way, certainly there is, at minimum, an issue of fact that precludes summary judgment. With regard to preemption, Mr. Bartlett points out that the Abbott case, he thinks, supports him, and the SEL, or semiconductor case, he thinks supports him. Those cases are very different. Mr. Bartlett doesn't mention the Dow case. It is clear, it couldn't be clearer as a matter of law, and we have a string cite in our brief that shows this. of this court that the unlawful act that constitutes the antitrust violation and a Walker process antitrust claim is the enforcement of the patent. Outside the patent office, it's not getting the patent in the first place, it's the enforcement of the patent. That couldn't be any clearer. We quote Professor Hovind, Professor Arita to that effect. We quote half a dozen decisions of this court that make that clear. Mr. Bartlett's argument is just wrong. The Abbott case and the semiconductor case involved situations where there was no enforcement, no judicial process. In the Abbott case, the court comes right out and says there was no judicial process in this case. All that was involved was what happened in the patent office. And likewise, in the semiconductor case, what it involved was a RICO claim, and what the plaintiff was trying to do was claim that what happened in the patent and trademark office was the predicate act, the only predicate act. And the court said, well, if the only predicate act that's an unlawful act under RICO is what happened in the patent office, then we're going to hold it to be preempted. Thank you. I think we have your argument.